IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| EUGENE BALL, | ) | CASE NO. 1:15-cv-00452 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Eugene Ball ("Plaintiff" or "Ball") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for Disability Insurance Benefits ("DIB"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 11. As explained more fully below, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

On July 21, 2011, Ball protectively filed an application for DIB.[1] Tr. 12, 147-148, 177. He alleged a disability onset date of September 10, 2010. Tr. 12, 147. He alleged disability due to left L3-4 disc protrusion, depression, stenosis, poor circulation, balance issues, and sleep issues. Tr. 62, 101, 112, 181. Ball's application was denied initially and upon reconsideration

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application." http://www.socialsecurity.gov/agency/glossary/ (last visited 12/28/2015).

by the state agency.  Tr. 100-103, 112-118.  Ball requested an administrative hearing.  Tr. 119-120.  On May 8, 2013, Administrative Law Judge Jeffrey Raeber ("ALJ") conducted an administrative hearing.  Tr. 30-61.

In his August 27, 2013, decision, the ALJ determined that Ball had not been under a disability from September 10, 2010, through the date of the decision. Tr. 9-27.  Ball requested review of the ALJ's decision by the Appeals Council.  Tr. 6-8.  On January 23, 2015, the Appeals Council denied Ball's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.    Personal, educational and vocational evidence

Ball was born in 1978.  147, 177.   He is married with two children, ages six and twelve at the time of the hearing.  Tr. 37.   Ball graduated from high school and attended two years of trade school.  Tr. 40.  He worked as a heating and cooling service technician and installer.  Tr. 36, 55.  He last worked in September 2010.  Tr. 36.

### B.    Medical evidence[2]

#### 1.  Treatment history

On July 28, 2010, Ball was involved in a motor vehicle accident while working.  Tr.  284.  He was driving a company truck and was hit on the passenger side of his truck by a wood chipping vehicle.  Tr. 284.  He was treated at the Medina Hospital Emergency Room for neck, shoulder, and back pain.  Tr. 252-261.  A July 28, 2010, lumbar spine x-ray showed degenerative arthritic changes involving the L4 and L5 levels and possible unilateral spondylolysis defect of the L5 on the left.  Tr. 262.  A July 28, 2010, cervical spine x-ray showed normal cervical

---

[2] Ball does not challenge the ALJ's findings regarding his alleged mental impairments.  Accordingly, the medical evidence summarized herein pertains generally to his physical impairment claim.

vertebrae and disc space heights; no compression fracture, subluxation, or other evidence of acute process.  Tr. 263.

Ball saw Dr. Douglas M. Ehrler, M.D., of the Crystal Clinic Orthopaedic Center on September 8, 2010, for his back pain.  Tr. 274-275.  Dr. Ehrler noted that he had seen Ball in the past, Ball had been in a couple accidents, and a past MRI showed a degenerative disc at L4-5 and L5-S1 with some mild right foraminal stenosis.  Tr. 275.  Ball complained of increasing back pain and a lot of numbness and tingling down both his legs.  Tr. 275.  Physical examination findings were generally normal.  Tr. 275.  For example, Ball was able to walk on his heels and toes; he was able to bend over and touch his toes; he had a normal gait and normal sensation; he had normal strength in the L4-5 and L5-S1 area; his sensation was intact to touch at L4, L5, and S1; he had no pain with internal and external rotation of either hip; and his straight leg raise test was negative.  Tr. 275.  AP and lateral, flexion-extension x-rays of Ball's back showed "[n]o gross motion, defect's, or step-off's" and "[m]inimal degenerative changes."  Tr. 274, 275.  Dr. Ehrler assessed back pain and bilateral numbness and tingling.  Tr. 275.  He ordered a new MRI for Ball's back because Ball had new neurological complaints with numbness and tingling in his legs.  Tr. 275.  Dr. Ehrler indicated he would see Ball following the new MRI and explained to Ball that if Ball could no longer stand the pain there were surgeries for multilevel degenerative disc disease.  Tr. 275.

Ball's lumbar spine MRI was completed on September 13, 2010 (Tr. 276-277) and, on September 20, 2010, Ball saw Dr. Ehrler for a follow up (Tr. 278).  Dr. Ehrler indicated that the MRI showed a degenerative disc at L4-5, L5-S1, foraminal stenosis at L4-5, L5-S1, greater on the right.  Tr. 278.  On physical examination, Ball had a normal gait and normal sensation; he had normal strength in the L4-5 and L5-S1 area; he had no pain with internal and external

rotation of either hip; his straight leg raise test was negative.  Tr. 278.  Dr. Ehrler assessed degenerative disc disease and stenosis.  Tr. 278.  Dr. Ehrler recommended that Ball continue with physical therapy, chiropractic treatment, and anti-inflammatories or have surgery.  Tr. 278. Ball indicated he would think about the recommendations and let Dr. Ehrler know how he wanted to proceed.  Tr. 278.

Ball saw Dr. Ehrler again on October 8, 2010, and asked about returning to work.  Tr. 279.  Dr. Ehrler advised Ball that he only holds people out of work for restrictions if they have a structural and dangerous problem, which Dr. Ehrler stated Ball did not have, noting that Ball's problem was pain.  Tr. 279.  Since Ball's problem was subjective, Dr. Ehrler indicated that the issue of returning to work was between Ball and his employer.  Tr. 279.  Physical examination findings were again normal, including normal gait and sensation; ability to walk on heels and toes; normal strength; no pain with internal and external rotation of either hip; and negative straight leg raise test.  Tr. 279.  Dr. Ehrler's assessment remained degenerative disc disease and stenosis and he advised Ball that if could not stand the pain he would be a good candidate for fusion surgery.  Tr. 279.  Ball indicated that he would contact Dr. Ehrler if he wanted to proceed with surgery.  Tr. 279.

On October 18, 2010, Ball saw Dr. Dane J. Donich, M.D., for a second opinion regarding Dr. Ehrler's fusion surgery recommendation.  Tr. 284-285.  Dr. Donich's physical examination findings included motor strength of at least 4/5 in all muscle groups with no clear focal areas of weakness; ability to ambulate briefly on his tiptoes as well as on his heels; ability to stand from a stooped position; mild impaired range of motion at the waist; negative straight leg raise test; and normal muscular tone.  Tr. 284.  Dr. Donich suggested an L4-5 decompression procedure as an alternative to a fusion procedure since Ball was relatively young and if the decompression was

not successful or if Ball had problems in the future, a fusion procedure would remain available as an option.  Tr. 285.  Ball indicated that he was considering his options.  Tr. 285.

In December 2010, Ball discussed his options with his primary care physician Karen Hummel, M.D.  Tr. 323-324.  He indicated an interest in the decompression procedure.  Tr. 323-324.  Dr. Hummel provided Ball with a referral to University Hospitals so that he could pursue further treatment.  Tr. 323-324.

On March 4, 2011, Ball saw Patrick J. McIntyre, M.D., with University Hospitals Case Medical Center Division of Pain Medicine.  Tr. 299-300.  Ball described his pain as burning in type, with it generally occurring in his right lower back, but sometimes in his left lower back. Tr. 299.  Ball reported having numbness down his legs after standing for over 30 minutes.  Tr. 299.  Ball indicated he had no relief from physical therapy or chiropractic treatment.  Tr. 299. He reported that he was able to sleep but had decreased physical activity.  Tr. 299.  On physical examination, Ball described some tenderness to his spine in the lumbar area of the right lower back but he was observed to stand and get up and walk with a normal gait; his range of motion was within normal limits; his strength in the hips and knees was also within normal limits; his reflexes were normal; and his sensation was intact.  Tr. 300.  Dr. McIntyre scheduled Ball for a diskogram and recommended that Ball start gabapentin to help control his nerve pain.  Tr. 300. On March 23, 2011, Dr. McIntyre performed the diskogram resulting in post-operative diagnoses of lumbosacral neuritis and displaced lumbar disk without myelopathy.  Tr. 296-297.

On May 8, 2012, Ball sought another surgical opinion from Michael D. Eppig, M.D.  Tr. 386-387.  Ball reported that he was on MS Contin for his pain.  Tr. 386.  He also reported that he had gained 50 pounds since 2009.  Tr. 386.  Ball indicated that he had no complaints of buttocks or leg pain; no problems with bowel or bladder function; no numbness in his lower extremities;

no weakness; and no problems with coordination, balance or gait.  Tr. 386.  His pain was in his

low back.  Tr. 386.  He reported that he had difficulty sleeping; his back hurt when he slept

supine; and his arms fall asleep when he slept on his side.  Tr. 386.  Physical examination

findings were generally normal.  Tr. 386-387.  However, Dr. Eppig noted that Ball had minimal

discomfort on maximum compression or palpation of the midline low back.  Tr. 386.  Dr. Eppig

reviewed Ball's prior MRIs.  Tr. 387.  Dr. Eppig advised Ball that he did not think that surgery

was needed and he did not think that a decompression procedure had any chance of improving

Ball's complaints of backaches.  Tr. 387.  Dr. Eppig "strongly advised" Ball to work at losing

weight and pursuing a fitness program.  Tr. 387.

From December 2011 through at least May 2013, Ball was treated by Ronald

Casselberry, M.D., with the Pain Relief Center, Inc.  Tr. 361, 391-403.  Beginning in December

2011, Dr. Casselberry prescribed OxyContin, Valium, and Percocet.  Tr. 361.  In June 2012, Dr.

Casselberry was prescribing Demerol, Valium and Morphine.  Tr. 403.  Through May 2013, Dr.

Casselberry continued prescribing Demerol, Valium and Morphine, noting that Ball reported

pain but also reported that the pain medication was effective.  Tr. 391-401.  Ball generally rated

his pain level as a 5 or 6 on scale of 0-10.  Tr. 391-401.

### 2. Medical opinion evidence

#### a. Treating physician

On May 30, 2013, Dr. Casselberry completed a Medical Source Statement regarding

Ball's physical capacity.  Tr. 389-390.  Dr. Casselberry opined that Ball's ability to lift,

stand/walk, sit, and perform other activities were limited due to his impairments.  Tr. 389-390.

He opined that (1) Ball could occasionally lift 10 pounds and could not frequently lift any

amount of weight; (2) Ball could stand/walk for a total of 2-3 hours in an 8-hour workday and

could stand/walk without interruption for 30 minutes; (3) Ball could sit for a total of 4 hours in an 8-hour workday and could sit without interruption for 30 minutes to 1 hour; (4) Ball could rarely climb, balance, stoop, and crouch and could occasionally kneel and crawl; (5) Ball could rarely perform fine or gross manipulation and could occasionally reach and push/pull; and (6) Ball had environmental restrictions, including exposure to heights, moving machinery, temperature extremes, and pulmonary irritants.  Tr. 389-390.  Dr. Casselberry also opined that Ball would need the ability to alternate between sitting, standing, and walking at will. Tr. 390.

Dr. Casselberry indicated that Ball had been prescribed a brace and a TENS Unit.  Tr. 390.  Dr. Casselberry opined that Ball's pain was severe and would interfere with his concentration; would take him off task; and would cause absenteeism.  Tr. 390.  Dr. Casselberry also opined that Ball would need to elevate his legs at will at 90 degrees and would require unscheduled rest periods during an 8-hour workday beyond the standard breaks.  Tr. 390.

### b. Consultative physician

Following the administrative hearing, on July 10, 2013, Sean Keyes, D.O., saw Ball and conducted a consultative examination.  Tr. 405-411.  Ball described his condition and symptoms for Dr. Keyes.  Tr. 405.  When Dr. Keyes entered the examination room, Ball was resting on the exam table. Tr. 406.   Dr. Keyes's physical examination findings included his findings that Ball was able to stand and ambulate around the room without difficulty; Ball could perform toe rise and heel rise without difficulty; there was a negative Romberg's sign; Ball had limited abduction of the bilateral arms secondary to pain; his forward flexion and extension were limited; Ball was able to get on the exam table without difficulty; Ball's muscle strength was 5/5 in all myotomes; sensation was intact in all dermatomes; reflexes were diminished at L4 and S1 and absent at C5-6-7 bilaterally; Ball's calves were soft; FABER test produced low back pain bilaterally, right

more than left; and straight leg raise test was negative.  Tr. 406.  Dr. Keyes assessed low back

pain.  Tr. 406.  He opined that:

> Based on the claimant's history of being unable to ambulate for any distance
> without discomfort, only being able to sit for up to 15 minutes and lift up to 10#
> secondary to back pain, at this time, he would qualify for sedentary work in an
> occupation allowing him to adjust positions as needed for comfort.

Tr. 406.

### c.  Reviewing physicians

On September 29, 2011, state agency reviewing physician Elizabeth Das, M.D.,

completed a physical residual capacity assessment.  Tr. 69-70.  She opined that Ball could

occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or

walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and, except

for the lift and/or carry restrictions, Ball had an unlimited ability to push and/or pull.  Tr. 69.  Dr.

Das also opined that Ball had postural limitations – he could occasionally climb ladders, ropes

and scaffolds; he could frequently climb ramps/stairs; he could frequently balance, kneel, crouch

and crawl; and he could never stoop.  Tr. 69.  In explaining her opinion, Dr. Das stated that:

> 3/11 MRI shows clt has some degenerative disc L2 and L3 with a bulging disc at
> L4, the L4-L5 junction.  This has not changed compared to prior MRIs.  PE shows
> clt was observed to stand and get up and walk with a normal gait.  The clt does
> describe that he has some tenderness to his spine in the lumbar area and on the
> right lower back.  All ROM was WNL.  Strength in the hips and knees was WNL.
> Sensation was intact.

Tr. 69-70.

Upon reconsideration, on March 23, 2012, state agency reviewing physician Diane

Manos, M.D., completed a physical residual capacity assessment.  Tr. 94-95.  Dr. Manos's

opinion was the same as Dr. Das's with the exception of her opinion regarding Ball's ability to

stoop.  Dr. Manos opined that Ball could occasionally stoop.  Tr. 94.   In contrast, Dr. Das had

opined that Ball could never stoop.  Tr. 69.

## C.    Testimonial evidence

### 1.    Ball's  testimony [3]

Ball was represented and testified at the administrative hearing.  Tr. 32, 36-54, 59-60.

Ball resides with his wife and two children.  Tr. 37.  He is able to drive but does so as little as

possible.  Tr. 37-38.  During the day, Ball does not do much of anything.  Tr. 38.  He sits on a

recliner most of the day and takes hot tubs at night to relieve some of the pain.  Tr. 38.  He has an

inverting bed that he lies in at times.  Tr. 38.  At night, in order to try to sleep, Ball has to have

his legs and head propped up.  Tr. 38.  He ends up stiff and hurting and tries to move on his side

but then his arms and hands go numb.  Tr. 47.  He sleeps for about 10 hours but because of the

constant waking and trying to fall back asleep, he estimated really getting only 6 hours of sleep.

Tr. 47.  He tries to help his wife with some of the household chores.  Tr. 47.

Ball testified that he is unable to work due to lifting limitations, an inability to be on

ladders, an inability to sit or stand for long periods of time, and the fact that his legs go numb and

he has fallen a lot of times.  Tr. 37, 41.   Ball does not try to lift while standing.  Tr. 45.  He

estimated being able to lift maybe 20 pounds while sitting.  Tr. 45.  He indicated that his back

pain in unbearable.  Tr. 41.  He feels like he has a knife in his back all the time.  Tr. 41.  After his

motor vehicle accident in 2010,[4] he started losing the feeling in his legs and falling down and

things continued to get worse.  Tr. 41, 51-52.   Ball's medications include Morphine, Demerol,

and Valium.  Tr. 49, 52-54.  He takes Valium to help him sleep.  Tr. 49.  He was put on

---

[3] During the hearing, Ball indicated he was in a lot of pain.  Tr. 38.  He was informed that if he needed to stand he could do so.  Tr. 38.

[4] Since 2008, Ball had been in three motor vehicle accidents.  Tr. 50.

Morphine following the July 2010 accident.  Tr. 53.  He uses the Demerol for break through

pain.  Tr. 53.  Even with the medicine that he takes, Ball still feels the pain.  Tr. 41.  Ball

estimated being able to stand without interruption for about 10 minutes due to the pain and being

able to walk in pain for about 30 minutes.  Tr. 45-46.  He can sit for about an hour and a half in a

recliner.  Tr. 46-47.  He then has to stand up and walk around for about 5 or 10 minutes and then

he can sit back down again.  Tr. 46-47.  Ball does not have problems using his hands or with

reaching.  Tr. 45.

 Prior to his accident in 2010, he was able to perform his daily activities but is unable to

do so now.[5]  Tr. 41, 51.  Following his accident in 2010, he did attempt to help with laundry and

mowing the lawn on a riding lawn mower.  Tr. 51.  It wasn't that he was really able to do so but

he wanted to try to pull his weight around the house.  Tr. 51.  His children now do the yard work

and his wife mows the lawn.  Tr. 51.  Also, he used to play basketball, swim, play tennis, and go

four-wheeling but has not engaged in those activities since before his motor vehicle accident that

occurred in July 2010.  Tr. 34, 39.  In 2012, he did travel with family to Virginia for a family

reunion.  Tr. 39.

 Ball has tried physical therapy and chiropractic treatments but none of it has helped.  Tr.

43.  Following the accident in 2010, he tried his best to get back to work but could not continue

to work.  Tr. 43.  When he would get out of his vehicle, he would be hunched over.  Tr.  43.  He

could not perform his daily activities.  Tr. 43.  It would take him a while to stand up straight.  Tr.

43.

---

[5] Ball indicated that he is able to bathe and dress himself.  Tr. 54.  He usually takes baths rather than showers
because showers require standing, which is what really causes him pain.  Tr. 54.

After he stopped working, Ball gained weight.  Tr. 40.  About a year and a half ago, one of his doctors recommended to Ball that he have two fusion surgeries[6] at the L4-L5 and L5-S1 levels but the doctor told Ball that he wants him to lose 50 pounds before he will perform surgery.  Tr. 40, 43-44.  Ball has been trying to eat better and lose weight.  Tr. 40.  He has not had the surgery because he was still working on losing weight.  Tr. 44.   Also, he is very nervous about the prospect of surgery so he has been looking into other options through the Laser Spine Institute.  Tr. 44, 59.

### 2.  Vocational Expert's testimony

Vocational Expert ("VE") Gene Burkhammer testified at the hearing.  Tr. 54-57.  The VE described Ball's past relevant work as an HVAC installer and technician as a medium exertional level (described by Ball as heavy), SVP 7 job.[7]  Tr. 55.

For his first hypothetical, the ALJ asked the VE to assume an individual with the same age, education and work experience as Ball who could work at the light level; would need to sit or stand or alternate positions; could never climb ladders, ropes or scaffolds; could occasionally climb ramps or stairs; could frequently balance; could occasionally stoop, kneel, crouch and crawl; and could never be exposed to unprotected heights.  Tr. 55.  The VE indicated that the described individual would be unable to perform Ball's past work.  Tr. 55.  However, the VE indicated that there would be sedentary, unskilled jobs available in the national economy that the individual could still perform, including (1) charge account clerk, with 300 jobs available locally, 3,000 in Ohio, and 90,000 nationally; (2) bench assembler, with 700 jobs available locally, 8,000

---

[6] Other doctors recommended only one fusion surgery.  Tr. 44.

[7] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation.  Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the skill level definitions  in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.  *Id.*

in Ohio, and 150,000 nationally; and (3) food and beverage order clerk, with 300 jobs available locally, 4,000 in Ohio, and 100,000 nationally.  Tr. 55-56.

For his second hypothetical, the ALJ asked the VE to add to the first hypothetical the additional limitation that the individual could sit for no more than 30 minutes before standing for 5 minutes and then could return to the seated position.  Tr. 56.  The VE indicated that if the individual could stay on task while standing then the jobs identified would remain available.  Tr. 56.

In response to the ALJ's third hypothetical, the VE indicated that, in order to perform the three jobs identified, it would be permissible for an individual to be off task up to 15 percent of the time on an ongoing basis.  Tr. 56.

In response to questioning from Ball's counsel, the VE indicated that, if the individual needed to walk away from the work-site for the 5 minutes included in the hypothetical, rather than stand, the jobs identified would only be available if the individual could still do the job while walking away for that period of time.  Tr. 57.  Otherwise, the individual would be off task for more than 15 percent of the time.  Tr. 57.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy[8] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[9] claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

---

[8] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[9] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

at Step Five to establish whether the claimant has the RFC and vocational factors to perform

work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his August 27, 2013, the ALJ made the following findings:[10]

1.    Ball met the insured status requirements through December 31, 2015.  Tr. 14.

2.    Ball had not engaged in substantial gainful activity since September 10, 2010, the alleged onset date.  Tr. 14.

3.    Ball had the following severe impairments: degenerative disc disease, spine disorder, and obesity.   He had the following non-severe impairments: bronchitis, esophageal reflux, and mental impairments of depression, psychosocial and environmental problems.  Tr. 14-16.

4.    Ball did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 16.

5.    Ball had the RFC to perform sedentary work except he had to be allowed to sit, stand, or alternate positions, with sitting for no more than 30 minutes at a time followed by standing for 5 minutes while remaining on task; he could never climb ladders, ropes, or scaffolds; he could occasionally climb ramps or stairs; he could frequently balance and occasionally stoop, kneel, crouch, and crawl; and he had to avoid unprotected heights.  Tr. 16-20.

6.    Ball was unable to perform past relevant work. Tr. 19.

7.    Ball was in 1978 and was 32 years old, defined as a younger individual age 18-44, on the alleged disability onset date.  Tr. 19.

8.    Ball had at least a high school education and was able to communicate in English.  Tr. 19.

9.    Transferability of job skills was not material to the determination of disability.  Tr. 21.

10.   Considering Ball's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Ball

---

[10] The ALJ's findings are summarized.

could perform, including charge account clerk, bench assembler, and food and beverage order clerk.  Tr. 21-22.

Based on the foregoing, the ALJ determined that Ball had not been under a disability from September 10, 2010, through the date of decision.  Tr. 22.

### V. Parties' Arguments

Ball argues that the ALJ erred by assigning little weight to the opinion of his treating physician Dr. Casselberry, arguing that, even if the ALJ properly determined that Dr. Casselberry's opinion was not entitled to controlling weight, the ALJ did not provide "good reasons" for discounting Dr. Casselberry's opinion.  Doc. 13, pp. 11-14.  Ball also argues that the ALJ's evaluation of one-time consultative examining physician Dr. Keyes was deficient because when weighing the opinion the ALJ cited to normal examination findings but omitted the findings regarding Ball's limited lumbar flexion, diminished and absent reflexes and painful bilateral FABER testing.  Doc. 13, pp. 14-15.  Ball argues further that the ALJ's decision to discount the opinions of both Dr. Casselberry and Dr. Keyes because they were based primarily on Ball's subjective reports was error because the ALJ failed to provide a meaningful analysis regarding his assessment of Ball's credibility.  Doc. 13, pp. 15-17.

In response, the Commissioner argues that the ALJ properly weighed the medical opinion evidence.  Doc. 15, pp. 5-7.  She argues that the ALJ's explanation of the weight assigned to Dr. Casselberry's opinion was not cursory in nature and satisfied the "good reasons" requirement under the treating physician rule.  Doc. 15, pp. 5-6.  The Commissioner also argues that the ALJ properly discounted Dr. Keyes's opinion based on the fact that it was based primarily on Ball's subjective reports and did not overlook medical findings that Ball contends support his claim of a disabling impairment.  Doc. 15, p. 7.  With respect to Ball's claim that the ALJ did not conduct a sufficient credibility assessment, the Commissioner asserts that the ALJ provided a

comprehensive summary of the medical evidence and sufficiently explained his basis for finding Ball's allegations regarding the extent of his limitation not fully credible.  Doc. 15, pp. 8-10.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## A.        The ALJ properly considered Dr. Casselberry's opinion

Ball argues that the ALJ failed to properly evaluate Dr. Casselberry's opinion under the treating physician rule.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c )(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

After discussing the details of Dr. Casselberry's May 2013 opinion, the ALJ explained the weight he assigned to Dr. Casselberry's opinion, stating:

> I grant little weight to Dr. Cassellberry's opinion.  Although he treated the claimant, his assessment finds little support in the record.  Indeed, Dr. Cassellberry's own treatment notes do not reflect such severe dysfunction rendering the claimant incapable of even basic work activity.  Rather, the exam findings in the record show largely normal strength, reflexes, and gait.  Such objective findings indicate that the claimant was capable of more than Dr. Cassellberry described.  Additionally, the claimant's own testimony that he had no problems with reaching or using his hands contradicts Dr. Cassellberry's evaluation.

Tr. 20.

Ball argues that, even if the ALJ correctly determined that Dr. Casselberry's opinion did not deserve controlling weight, the ALJ failed to comply with the "good reasons" rule because the ALJ did not consider the extensive treatment relationship between Dr. Casselberry and Ball; did not consider Dr. Casselberry's specialty as a pain medicine provider; and did not consider that Dr. Casselberry prescribed medications that are used for severe pain and would further affect Ball's ability to stay on task. Doc. 13, pp. 11-14.

Contrary to Ball's claim, the ALJ considered the treatment relationship between Dr. Casselberry and Ball. Tr. 20. However, the ALJ concluded that Dr. Casselberry's own treatment notes did not support his severe opinion. Tr. 20. Instead, the examination findings showed largely normal strength, reflexes and gait. Tr. 20. Further, the ALJ found that Ball's own hearing testimony regarding his ability to reach and use his hands was inconsistent with Dr. Casselberry's opinion. Tr. 20. For example, Ball testified that he had no problems using his hands and no problems reaching. Tr. 45. Yet, Dr. Casselberry included limitations with respect to Ball's ability to reach and perform fine and gross manipulation. Tr. 390. Under 20 C.F.R. § 404.1527(c), the ALJ properly considered supportability and consistency when weighing Dr. Casselberry's opinion. Also, Ball does not specifically challenge the ALJ's finding that Dr. Casselberry's opinion was not supported by and/or was inconsistent with Dr. Casselberry's own treatment notes, largely normal examination findings, and/or or Ball's own testimony. Rather, he argues that there is other evidence in the record consistent with Dr. Casselberry's opinion. Doc. 13, p. 14. Yet, even if there was evidence to support Ball's claim, this Court cannot overturn the Commissioner's decision where, as here, "substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

Also, contrary to Ball's claim, the ALJ considered the type of medication that Dr. Casselberry prescribed, including Oxycontin, Valium, and Percocet (Tr. 18 (citing Exhibit 11F/4 (Tr. 362)) and Demerol and Morphine (Tr. 20 (citing Exhibit 17F (Tr. 389-403)).  As indicated by the ALJ, Ball reported that, while he continued to have some symptoms, his medications were generally effective in controlling his pain.  Tr. 20 (citing for example Exhibit 17F/12 (Tr. 400)).

While an ALJ's decision must include "good reasons" for the weight provided, the ALJ is not obliged to provide "an exhaustive factor-by-factor analysis."  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).  Here, the ALJ weighed Dr. Casselberry's opinion and explained the reasons for providing little weight to that opinion.  Ball has failed to demonstrate that the ALJ's reasons are not supported by substantial evidence nor has he shown that the ALJ's analysis fails to allow for meaningful review of the ALJ's consideration of his treating physician's opinion.  Accordingly, reversal and remand is not warranted for further consideration of Dr. Casselberry's opinion.

**B.**  **The  ALJ properly considered Dr. Keyes's opinion**

Ball also argues that the ALJ erred in his analysis of Dr. Keyes's opinion.  Doc. 13, pp. 14-15.  As a one-time examining consultative physician, Dr. Keyes's opinion was not entitled to controlling weight.  *See Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005); *Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006).  Although not a treating physician, in accordance with the Regulations, the ALJ considered and weighed the opinion of Dr. Keyes, stating:

> I give weight to Dr. Keyes' opinion because he had the opportunity to examine the claimant.  However, his conclusions appeared to be an adoption of the claimant's subjective assessment of his own capabilities rather than objective findings.  Indeed, the exam showed relatively minor abnormalities, with a normal gait, intact strength, and negative straight leg raising.  Nevertheless, in considering the combination of the claimant's obesity and back conditions, with

his leg symptoms, I limited him to sedentary work with an option to alternate positions.

Tr. 19.

Ball contends that the ALJ  erred because, when discounting Dr. Keyes's opinion on the ground that it was generally an adoption of Ball's subjective allegations, the ALJ referenced Dr. Keyes's normal examination findings but omitted other findings such as limited lumbar flexion, diminished and absent reflexes and painful FABER testing.  Doc. 13, pp. 14-15.  However, while the ALJ did not detail all of Dr. Keyes's findings, the ALJ acknowledged that there were some relatively minor abnormalities noted in Dr. Keyes's findings.  Tr. 19.  Additionally, "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons v. Barnhart*, 114 Fed. Appx. 727, 733 (6th Cir. 2004).

Ball also argues that, while it may be proper to reject a medical opinion when it is based primarily on a claimant's subjective reports, the ALJ's decision to do so in this instance was error because the ALJ failed to conduct a meaningful analysis of why he found Ball's subjective reports less than fully credible.  Doc. 13, pp. 15-17.  When evaluating the intensity and persistence of a claimant's symptoms, consideration is to be given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c); SSR 96–7p, *Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an*

*Individual's Statements*, 1996 WL 374186, at 3 (July 2, 1996) ("SSR 96-7p").  "An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

Here, consistent with the Regulations, the ALJ conducted a thorough analysis of the evidence, including Ball's subjective allegations and treatment history (Tr. 17-20) and he made clear his reasons for finding Ball's subjective allegations less than credible, stating:

> With respect to the claimant's alleged limitations, I find such assertions only partially credible.  While the claimant had ongoing complaints, his treatment course remained largely stable with medication, suggesting he was generally satisfied with the degree of relief he received.  Indeed, following a consultation in 2012, the claimant was advised that surgery was not indicated.  Rather, the treatment notes reflect ostensibly normal strength, a steady gait, intact sensation, and negative straight leg raising.  Such findings do not support the significant level of dysfunction that the claimant described.

Tr. 19.

It is not for this Court to "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility."  *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).  In reviewing an ALJ's credibility determination, a court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record."  *Jones v.*, 336 F.3d at 476.  While Ball disagrees with the ALJ's credibility assessment and challenges the ALJ's evaluation of the evidence, Ball has not demonstrated that the ALJ's credibility assessment was not supported by substantial evidence.  Here, the ALJ's analysis was not limited to a single piece of evidence and is sufficiently clear to allow this Court to determine whether the ALJ conducted a proper credibility assessment and

whether that determination is supported by substantial evidence.  SSR 96–7p, 1996 WL 374186, at 4.

Based on the foregoing, the Court finds that the ALJ's consideration of Dr. Keyes's opinion and his decision to discount Dr. Keyes's opinion on the basis that it rested primarily on Ball's self-reports, which the ALJ determined were only partially credible, was proper and supported by substantial evidence.[11]  The ALJ did not disregard Ball's subjective complaints.  Rather, upon consideration of Ball's subjective allegations along with other relevant evidence, including the medical opinion evidence, the ALJ restricted Ball to sedentary level work with additional limitations.  Tr.  16.   Ball has not demonstrated that the ALJ's decision is not supported by substantial evidence or that reversal and remand is warranted for further consideration of Dr. Keyes's opinion.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

December 28, 2015

Kathleen B. Burke
United States Magistrate Judge

---

[11] Ball also claims that the ALJ's evaluation of Dr. Casselberry's opinion was faulty because the ALJ did not properly explain his assessment of Ball's credibility.  Doc. 13, p. 17.  However, for the reasons discussed herein, the Court finds that the ALJ's credibility assessment was proper.  Therefore, his argument as it relates to Dr. Casselberry also fails.